**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------X

ADEGOKE SAMSON ADEPOJU,

                Plaintiff,

          - against -

PUBMATIC, INC., as well as JEFF HIRSCH
and JOHANNA BAUMAN, *Individually*,

                Defendants.

-------------------------------------------------------------------X

**Case No.**

**COMPLAINT**

**PLAINTIFF DEMANDS**
**A TRIAL BY JURY**

Plaintiff, ADEGOKE SAMSON ADEPOJU, by his attorneys, PHILLIPS &

ASSOCIATES, Attorneys at Law, PLLC, hereby complains of Defendants, by alleging and

averring, including upon information and belief, as follows:

## NATURE OF THE CASE

1.    This is the case of a media company that proudly proclaims being "biased towards action"

actually being unlawfully biased against an African American, disabled employee and

taking the wrong kind of action by terminating him.

2.    The Plaintiff brings this action alleging that Defendants have violated Title VII of the

Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e, *et seq.* (amended in 1972,

1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166) ("Title VII"); the

Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101, *et seq.* ("ADA"), as

amended by the ADA Amendments Act of 2008 (Pub. L. No. 110-325) ("ADAA"); the

Family and Medical Leave Act, 29 U.S.C. §§ 2601, *et seq.* ("FMLA"); the New York

State Human Rights Law, New York State Executive Law, §§ 296, *et seq.* ("NYSHRL");

and the New York City Human Rights Law, New York City Administrative Code §§ 8-

502(a), *et. seq.* ("NYCHRL").

3.   Plaintiff seeks damages, as well as injunctive and declaratory relief, to redress the injuries he has suffered – physical, emotional and pecuniary -- as a result of being discriminated and retaliated against by his employer on the basis of his race (African American), disability (actual or perceived), and leave status – i.e., for requesting a reasonable accommodation, and for taking a legally protected leave of absence -- which ultimately resulted in the unlawful termination of his employment solely due to his constituency in the foregoing protected categories.

**JURISDICTION, VENUE AND PROCEDURAL PREREQUISITES**

4.   Jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. §§ 1331 and 1343.

5.   The Court has supplemental jurisdiction over the claims of Plaintiff brought under city and state law pursuant to 28 U.S.C. § 1367.

6.   Venue is proper in this district pursuant to 28 U.S.C. §1391(b) as one or more Defendants reside within the Southern District of New York and the acts complained of occurred therein.

7.   By (a) timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on August 17, 2018; (b) receiving a Notice of Right to Sue from the EEOC on October 25, 2018; (c) commencing this action within 90 days of the issuance of the Notice of Right to Sue by the EEOC; and (d) contemporaneously with the filing of this Complaint, mailing a copies thereof to the New York City Commission of Human Rights ("NYCCHR") and the Office of the Corporation Counsel of the City of New York pursuant to the notice requirements of Section 8-502 of the New York City

Administrative Code, Plaintiff has satisfied all of the procedural prerequisites for the commencement of the instant action. A copy of the Notice of Right to Sue is annexed hereto as Exhibit A; a copy of the transmittal letter to the NYCCHR, *et ano.*, is annexed hereto as Exhibit B.

## THE PARTIES

8.   At all times relevant hereto, Plaintiff ADEGOKE SAMSON ADEPOJU ("ADEPOJU") is a resident of the State of New York and County of Nassau.

9.   At all times relevant hereto, Defendant PUBMATIC, INC. ("PUBMATIC") was and is a domestic for-profit corporation duly existing pursuant to, and by virtue of, the laws of the State of New York. Defendant PUBMATIC is headquartered in Redwood, California, but also maintains a principal place of business located at 229 West 43rd Street, 7th Floor, New York, NY 10036.

10.   Upon information and belief, Defendant PUBMATIC is a digital media company that employs over 200 individuals on a full-time or full-time equivalent basis and thus is subject to all statutes upon which Plaintiff is proceeding herein.

11.   At all times relevant hereto, Plaintiff was an employee of Defendant PUBMATIC.

12.   Upon information and belief, at times relevant hereto, Defendant JEFF HIRSCH ("HIRSCH") was and is an individual residing in the State of New York, as well as an employee of Defendant PUBMATIC, holding the position of "Chief Marketing Officer and Head of Publisher Development."

13.   Upon information and belief, at all times relevant hereto, Defendant JOHANNA

3

BAUMAN ("BAUMAN") was and is an individual residing in the State of New York, an employee of Defendant PUBMATIC holding the position of "Vice President, Marketing Communications," as well as Plaintiff's supervisor who had supervisory authority over Plaintiff.

14. Specifically, Defendants HIRSCH and BAUMAN had the authority to hire, terminate, and affect the terms and conditions of Plaintiff's employment or to otherwise influence the decision making regarding same.

15. Defendant PUBMATIC, Defendant HIRSCH, and Defendant BAUMAN are collectively referred to herein as "Defendants."

## MATERIAL FACTS

16. On or about July 5, 2017, Plaintiff ADEPOJU was hired for the position of Director of Corporate Communications with Defendant PUBMATIC after interviewing perfunctorily with Defendants HIRSCH and BAUMAN and in-depth with Kirk McDonald, then-President of Defendant PUBMATIC.

17. Upon information and belief, Mr. McDonald was instrumental in the decision to hire Plaintiff, over the objections of Defendants HIRSCH and BAUMAN, and recruited Plaintiff during the interviewing process by telling him that he would have a sizeable role in the outward facing marketing efforts of Defendant PUBMATIC.

18. Upon information and belief, Defendants HIRSCH and BAUMAN had instead wanted to hire Annika Mitic, into the position in question because she was known to or friendly with one or both of the Defendants.

19. Plaintiff and Mr. McDonald are African American; Defendants HIRSCH and BAUMAN, as well as Ms. Mitic, upon information and belief, are all Caucasian.

20.    Within a matter of weeks after hiring Plaintiff, Mr. McDonald was abruptly demoted from the position of President to the position of Special Advisor to the CEO. Upon information and belief, Mr. McDonald's duties and responsibilities were assumed, in large part, by Defendant HIRSCH.

21.    Around that same time, and in fact shortly after Plaintiff began his employment with Defendant PUBMATIC, Defendant BAUMAN went out on maternity leave, which left Plaintiff without sufficient direction or orientation.

22.    During her maternity leave from in or about September 2017 to in or about January 2018, Defendant BAUMAN had little communication with Plaintiff, yet communicated regularly with Defendant HIRSCH and, later on, Ms. Mitic.

23.    During this time, Plaintiff also had difficulty gaining an audience with Defendant HIRSCH when he needed guidance regarding critical marketing efforts.

24.    Thus, Plaintiff was left without the necessary support to master his new position but nevertheless did his best to perform his job in a vacuum.

25.    Upon information and belief, on or about July 17, 2017, Defendants hired Ms. Mitic into the position of Manager of Marketing Programs, which ostensibly fell under the purview of the Director of Corporate Communications.

26.    In or about December 2017, Plaintiff had a conversation with Ms. Mitic wherein she informed him that she had applied for his position and that she believed she had more experience managing people than did he, and that when she had learned from Defendant BAUMAN that Plaintiff had gotten the position, Defendant BAUMAN had also informed her that Defendants would "find a place for her in due time."

27.    During the time Plaintiff was employed with Defendant PUBMATIC, Ms. Mitic often

stated to Plaintiff that his immediate team was "so United Nations" or "very international" and that she understood "Third World people" because her husband was of Serbian descent/origin.

28.    Plaintiff felt offended, disturbed, and humiliated by Ms. Mitic's blatantly unlawful and discriminatory comments, which caused him to experience a hostile work environment on the basis of his race.

29.    Shortly after Defendant BAUMAN returned from her maternity leave in or about January 2018, she inexplicably placed Plaintiff on a 30-day performance improvement plan ("PIP") notwithstanding the fact that by all objective criteria – i.e., producing several crucial press releases, contributing to numerous critical executive presentations for the annual company offsite, and mustering publicity for the auction dynamics primer/whitepaper within a few weeks of being hired -- Plaintiff had performed his job admirably.

30.    When Plaintiff expressed shock and dismay that he was being placed on a PIP, Defendant BAUMAN offered only vague explanations such as Plaintiff "not leading enough" and "waiting for others to express their opinions before giving direction."

31.    Defendant BAUMAN also criticized Plaintiff for coming in late -- i.e., between 9:00 a.m. and 9:30 a.m. – which was often the time she would arrive, although there was no standard reporting time to the office and employees often telecommuted with their company-issued laptops at all hours of the day.

32.    Before being put on the PIP, Plaintiff would routinely arrive at the office by approximately 9:30 a.m. and leave no earlier than approximately 6:30 p.m. After the PIP, Plaintiff would arrive at the office by approximately 8:30 a.m. and leave no earlier than

approximately 7:00 p.m.

33. Moreover, Defendant BAUMAN stated, without basis, that Plaintiff's writing was "not up to snuff" although Plaintiff had received his Bachelor's degree from Syracuse University, with studies in information management and technology as well as public communications from the prestigious S.I. Newhouse School of Public Communications, as well as a Master of Arts degree with merit in public communication and public relations from the University of Westminster in London, England.

34. In this context, Defendant BAUMAN also indicated that Plaintiff was "too friendly" with two members of his immediate team, one of whom was of Indonesian descent/origin and the other of whom was of Mexican descent/origin.

35. When Plaintiff tried object to the validity of the PIP, as well as Defendant BAUMAN's other unsubstantiated criticisms, she dismissed him stating that she had discussed it all with Defendant HIRSCH, who was in complete agreement with her.

36. During this period of time – after Defendant BAUMAN returned from maternity leave and almost immediately placed Plaintiff on a PIP – she would often praise Ms. Matic for the types of accomplishments she would routinely ignore from Plaintiff. For example, achievement certificates were awarded to Ms. Mitic for Twitter chats and blog posts that, upon information and belief, yielded no discernable results, and for covering Defendant BAUMAN's work while she was on maternity leave.

37. Defendant BAUMAN never asked Plaintiff to cover her work while she was on maternity leave although, organizationally, his position and functions were much more closely related to Defendant BAUMAN'S role than were Ms. Mittic's.

38. Nevertheless, from in or about January through in or about March 2018, Defendant

BAUMAN commented several times to Plaintiff that he was doing well on his PIP and meeting his goals of improvement.

39.    On or about the evening of February 16, 2018, approximately two weeks before Plaintiff was due to successfully complete his PIP, he suffered an unfortunate accident in his home that rendered him unable to walk without great pain and discomfort for what became an indeterminate period of time.

40.    Specifically, Plaintiff slipped and sustained a gash to his right foot, which deeply imbedded several wooden splinters in his heel.

41.    Despite the pain he felt in his right foot, Plaintiff limped back to work on February 19, before calling out sick on February 20, 2018, in order to see a doctor and have an x-ray performed.

42.    With significant pain and discomfort, Plaintiff continued to report to work from in or about February 21 through in or about February 26, 2018, all that time bearing a noticeable limp and orthopedic boot on his right foot.

43.    On February 27, 2018, Plaintiff was diagnosed by his podiatrist with a large foreign object imbedded deep in his right heel and was ordered to keep weight of his left foot and referred to an orthopedic surgeon.

44.    Plaintiff's injury constituted a serious medical condition under applicable law.

45.    Plaintiff's injury resulted in an actual or perceived disability that chronically or indefinitely impaired his major life activity of walking.

46.    From February 27, through March 1, 2018, Plaintiff worked from home with the knowledge and consent of Defendant BAUMAN.

47.    On or about March 1, 2018, Plaintiff consulted with his orthopedic surgeon and was

given a surgery date of March 16, 2018, which he immediately conveyed to Defendant BAUMAN.

48. The next communication Plaintiff had with Defendant PUBMATIC was through its Human Resources Department, wherein he was told by Lorrie Dougherty that he had to go out on temporary disability.

49. When Plaintiff persisted that it did not make sense that he be forced to go out on disability when he was perfectly capable of doing his work from home, as many of his colleagues did by routinely telecommuting, Ms. Daugherty insisted that Plaintiff could not do so and that "telecommuting was only for temporary emergencies like snow storms."

50. Thus, Plaintiff was not allowed to return to work by Defendant PUBMATIC prior to his surgery.

51. Upon information and belief, when Plaintiff asked if he could instead work from home at least until the surgery, Ms. Daugherty responded "no, it's best that you be on disability status in order to protect yourself and the company."

52. Upon information and belief, Defendant PUBMATIC had allowed several employees who were not African American to telecommute for prolonged periods of time without requiring them to go on disability status.

53. The immediately foregoing conduct by Defendant PUBMATIC constitutes unlawful disparate treatment on the basis of race.

54. Plaintiff's request of Defendant PUBMATIC that he be allowed to work from home constituted a request for reasonable accommodation to perform the essential functions of his job.

55.   Defendant PUBMATIC's summary rejection of Plaintiff's request constituted an unlawful denial of reasonable accommodation without a sufficiently interactive process.

56.   In or about mid-March 2018, Plaintiff received his short-term disability paperwork from Defendant PUBMATIC.

57.   On or about March 16, 2018, Plaintiff underwent what was thought to be a successful surgery removing the splinter from his right foot and received a restrictive prognosis of 90 days non-weightbearing.

58.   Accordingly, Plaintiff was instructed by the Human Resources Department of Defendant PUBMATIC to put a message of his company email that he was out until June 8, 2018.

59.   From the time of his surgery to in or about mid-May 2018, Plaintiff kept abreast of his company email and communicated to the Human Resources Department of Defendant PUBMATIC that he intended to return to work on or about June 8, 2018.

60.   In or about the week of May 21, 2018, Plaintiff had a follow-up visit with his orthopedic surgeon and was told that he could slowly begin bearing weight on his right foot. Immediately upon doing so, Plaintiff experienced significant pain and discomfort.

61.   During this same week, Plaintiff responded to a status inquiry email, from the Human Resources Department of Defendant PUBMATIC, and stated clearly that he still intended to return to work on or about June 8, 2018.  Plaintiff explained that he would not know definitively, however, until he saw his orthopedic surgeon for a follow-up visit on or about June 5, 2018.

62.   On June 5, 2018, Plaintiff saw his orthopedic surgeon and was told that the continued pain and discomfort he was experiencing when bearing weight on his right foot, indicated a foreign body still remained in the heel that needed to be removed.

63.   Accordingly, Plaintiff was instructed by his physician that he could not return to work for a minimum of two more weeks, which he immediately communicated to Defendant PUBMATIC.

64.   On June 7, 2018, Plaintiff's employment was terminated by Defendant PUBMATIC for the pretextual reason of a "reduction in force."

65.   Upon information and belief, shortly after Plaintiff was terminated, Ms. Mitic was promoted to the newly created position of Senior Manager of Marketing Communications where she assumed most, if not all, of the functions and responsibilities previously held by Plaintiff.

66.   Upon information and belief, when Plaintiff was terminated by Defendants, he had just reached or was on the precipice of reaching eligible status – i.e., one year or 1250 hours of continuous employment -- under the FMLA.

67.   Upon information and belief, Plaintiff's performance was, above average during the course of his employment with Defendants.

68.   Upon information and belief, Defendants' unlawful disparate treatment of Plaintiff was flagrant, notorious, and recklessly indifferent towards any norm of fairness to which Plaintiff is entitled, if not intentionally disregarding of same.

69.   Upon information and belief, Defendants terminated Plaintiff's employment solely because of Plaintiff's race, actual or perceived disability, and for fear that he would soon be eligible for FMLA leave; therefore, any other reason supplied was and is merely pretextual.

70.   But for the facts stated in the immediately preceding paragraph, Defendants would not have terminated Plaintiff's employment.

71.    Plaintiff feels offended, disturbed, and humiliated by the blatantly unlawful and discriminatory termination he suffered at the hands of Defendants.

72.    Plaintiff has been unlawfully discriminated against, humiliated, and degraded, and as a result, suffers loss of rights, emotional distress, loss of income and earnings.

73.    Defendants' actions and conduct were intentional for the purpose of harming Plaintiff.

74.    As a result of Defendants' actions, Plaintiff feels extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

75.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff further experienced severe emotional and physical distress.

76.    As a result of the above, Plaintiff has been damaged in an amount in excess of the jurisdiction of the Court.

77.    Because Defendants' conduct has been malicious, willful, outrageous, and done with full knowledge of the legion of law to the contrary, Plaintiff demands punitive damages as against all Defendants, jointly and severally.

### AS A FIRST CAUSE OF ACTION
### FOR DISCRIMINATION AND RETALIATION UNDER TITLE VII
### (Not Against Individual Defendants)

78.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

79.    This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, for relief based upon the unlawful employment practices of the above-named Defendant PUBMATIC. Plaintiff complains of Defendant PUBMATIC's violation of Title VII's prohibition against discrimination and retaliation in employment based, in whole or in part, upon an employee's race (black) or ethnicity/national origin (African), whether actual or perceived.

80.    Defendant PUBMATIC engaged in unlawful employment practices prohibited by 42 U.S.C. §§ 2000e, *et seq.*, by discriminating against Plaintiff because of his race (black) or ethnicity/national origin (African), whether actual or perceived.

81.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damages including but not limited to economic and pecuniary losses (past and future) – such as income, salary, benefits, bonuses, commission and other compensation that his employment entailed; severe emotional, psychological and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

82. Accordingly, as a result of Defendant PUBMATIC's unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to him under this law.

## AS A SECOND CAUSE OF ACTION
## FOR DISCRIMINATION AND RETALIATION UNDER THE ADA/ADAA
### <u>(Not Against Individual Defendants)</u>

83.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

84.    Section 12112 of the ADA states: "(a) General rule. - No covered entity shall discriminate

against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

85.     During the relevant time period the Plaintiff suffered from a physical disability that substantially interfered with a major life activity in and out of work – i.e., walking.

86.     Defendant PUBMATIC was informed and aware of Plaintiff's disability; indeed, Plaintiff requested accommodation following his accident and injury, including being allowed to telecommute both before and after his surgery.

87.     Defendant PUBMATIC was further informed and aware of the Plaintiff's disability as Plaintiff was required to produce documentation from his orthopedic surgeon describing the medical restrictions on his ability to work.

88.     Plaintiff had fulfilled the reasonable expectations of Defendant PUBMATIC by carrying out the responsibilities assigned to him, without reasonable accommodation, before his accident and injury, yet Defendant PUBMATIC terminated his employment after he asked for reasonable accommodation because of his accident and injury.

89.     Plaintiff was able to continue to perform the essential functions and elements of his position at all times with the reasonable accommodation – i.e., telecommuting both before and after his surgery for a limited period of time.

90.     Defendant PUBMATIC, immediately following the initial accident causing Plaintiff's disability, directed Plaintiff to provide medical documentation of his injury.

91.     By refusing to allow Plaintiff to telecommute both before and after his surgery for a limited period of time – especially when it had afforded such opportunity to other employees in the past – and terminating Plaintiff shortly after he had reiterated his request

for such reasonable accommodation, Defendant PUBMATIC'S conduct constituted an unlawful refusal to provide a reasonable accommodation.

92. The reason stated by Defendant PUBMATIC of "reduction in workforce" for terminating Plaintiff's employment was merely a pretext for the discriminatory motive to terminate Plaintiff because of his disability, whether actual or perceived.

93. As Plaintiff had no performance issues prior to his surgery, Defendant PUBMATIC had no good-faith business justification to terminate him.

94. Defendant PUBMATIC never intended to give Plaintiff an opportunity to provide medical documentation because its sole purpose and intent was to fabricate a pretextual reason to terminate Plaintiff and deny him reasonable accommodation for his actual or perceived disability.

95. Indeed, Defendant PUBMATIC retaliated against Plaintiff by terminating him for engaging in protected activity – i.e., requesting the reasonable accommodation that he be allowed to work from home leading up and recovering from his foot surgery.

96. Defendant PUBMATIC had no good faith business justification for the actions taken against Plaintiff.

97. Defendant PUBMATIC engaged in an unlawful discriminatory practice by terminating Plaintiff because of his perceived or actual disability.

98. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damages including but not limited to economic and pecuniary losses (past and future) – such as income, salary, benefits, bonuses, commission and other compensation that his employment entailed; severe emotional, psychological and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other

non-pecuniary losses and special damages.

99. Accordingly, as a result of Defendant PUBMATIC's unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to him under this law.

**AS A THIRD CAUSE OF ACTION
FOR VIOLATION OF THE FMLA
<u>(Not Against Individual Defendants)</u>**

100.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

101.    Section 2612(D) of the FMLA, states in pertinent part: "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period … Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee."

102.    Section 2615(a) of the Family Medical Leave Act, states in pertinent part:

> Interference with rights. (1) Exercise of rights. It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter. (2) Discrimination. It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

103. Defendant PUBMATIC interfered with Plaintiff's actual or impending protected status under the FMLA by (a) forcing him to go on short-term disability while unprotected by the FMLA so as to delay his coverage thereunder and (b) subsequently abruptly terminating his employment when he was about to, or had just, become eligible for protection under the FMLA.

104. Defendants violation of the FMLA was either willful or reckless, negligent and not in good faith.

105. As a result of the acts and conduct complained of herein, Plaintiff suffered and will continue to suffer damages including but not limited to economic and pecuniary losses (past and future) – such as income, salary, benefits, bonuses, commission and other compensation that his employment entailed; severe emotional, psychological and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

106. Accordingly, as a result of Defendant PUBMATIC's unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to him under this law.

## AS A FOURTH CAUSE OF ACTION FOR DISCRIMINATION AND RETALIATION UNDER THE NEW YORK STATE LAW (Against All Defendants)

107. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

108. Executive Law § 296 provides that:

> 1. It shall be an unlawful discriminatory practice: "(a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

109. Defendants engaged in unlawful discriminatory and retaliatory practices against Plaintiff

because of his race (black) or ethnicity/national origin (African), whether actual or perceived, as well as his disability, whether actual or perceived.

110.   As a result of the acts and conduct complained of herein, Plaintiff suffered and will continue to suffer damages including but not limited to economic and pecuniary losses (past and future) – such as income, salary, benefits, bonuses, commission and other compensation that his employment entailed; severe emotional, psychological and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

111.   Accordingly, as a result of Defendants' unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to him under this law.

### AS A FIFTH CAUSE OF ACTION
### UNDER STATE LAW AIDING AND ABETTING
### (Against Individual Defendants Only)

112.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

113.   New York State Executive Law § 296(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

114.   Defendants BAUMAN and HIRSCH engaged in unlawful discriminatory and retaliatory practices in violation of New York State Executive Law § 296(6) by aiding, abetting, inciting, compelling and coercing the discriminatory or retaliatory conduct against Plaintiff.

115.   As a result of the acts and conduct complained of herein, Plaintiff suffered and will

continue to suffer damages including but not limited to economic and pecuniary losses (past and future) – such as income, salary, benefits, bonuses, commission and other compensation that his employment entailed; severe emotional, psychological and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

116. Accordingly, as a result of the unlawful conduct Defendants BAUMAN and HIRSCH, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to him under this law.

### AS AN SIXTH CAUSE OF ACTION FOR DISCRIMINATION AND RETALIATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE (Against All Defendants)

117. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

118. The New York City Administrative Code §8-107(1) provides that:

> It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

119. Defendants engaged in unlawful discriminatory and retaliatory practices in violation of the New York City Administrative Code § 8-107(1)(a) by creating and maintaining unlawful working conditions, and otherwise discriminating and retaliating against Plaintiff because of his race (black) or ethnicity/national origin (African), whether actual or perceived, as well as his disability, whether actual or perceived.

120.   As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damages including but not limited to economic and pecuniary losses (past and future) – such as income, salary, benefits, bonuses, commission and other compensation that his employment entailed; severe emotional, psychological and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

121.   Accordingly, as a result of Defendants' unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to him under this law.

## AS A SEVENTH CAUSE OF ACTION FOR DISCRIMINATION AND RETALIATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
### (Against Individual Defendants Only)

122.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

123.   The New York City Administrative Code § 8-107(6) provides that it shall be unlawful discriminatory or retaliatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

124.   Defendants BAUMAN and HIRSCH engaged in unlawful discriminatory and retaliatory practices in violation of New York City Administrative Code § 8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory, unlawful and retaliatory conduct against Plaintiff.

125.   As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damages including but not limited to economic and pecuniary losses (past and future) – such as income, salary, benefits, bonuses, commission and other

compensation that his employment entailed; severe emotional, psychological and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

126. Accordingly, as a result of the unlawful conduct of Defendants BAUMAN and HIRSCH, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to him under this law.

### JURY DEMAND

127. Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants:

A.   Declaring that Defendants engaged in, and enjoining Defendants from continuing to engage in, unlawful employment practices prohibited by the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et. seq.*; the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101, *et seq.* ("ADA"), as amended by the ADA Amendments Act of 2008 (Pub. L. No. 110-325) ("ADAA"); the Family and Medical Leave Act, 29 U.S.C. §§ 2601, *et seq.* ("FMLA"); the New York State Human Rights Law, New York State Executive Law, §§ 296, *et. seq.*; and the New York City Human Rights Law, New York City Administrative Code, §8-107, *et. seq.*, in that Defendants discriminated and retaliated against Plaintiff on the basis of his race (black) or ethnicity/national origin (African), whether actual or perceived; his disability, whether actual or perceived; and his protected status (actual or impending) under the FMLA;

B.   Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendants' unlawful discrimination and to otherwise make him whole for any losses suffered as a result of such unlawful employment practices;

C.    Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to his reputation in an amount to be proven at trial;

D.    Awarding Plaintiff punitive damages under all appropriate statutes;

E.    Awarding Plaintiff liquidated damages under all appropriate statutes;

F.    Awarding Plaintiff attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of this action as authorized under all appropriate statutes;

G.    Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendants' unlawful employment practices against him.

Dated: New York, New York
       November 12, 2018

PHILLIPS & ASSOCIATES,
ATTORNEYS AT LAW, PLLC

By:  _____
     Parisis G. Filippatos (PF1593)
     *Attorneys for Plaintiff*
     45 Broadway, Suite 620
     New York, New York 10006
     (212) 248-7431
     PFilippatos@tpglaws.com